470 December 5, 2017 No. 43

IN THE OREGON TAX COURT
REGULAR DIVISION

STAFFORD HILLS PROPERTIES, LLC,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant*,

*and*

CLACKAMAS COUNTY ASSESSOR,
*Defendant-Intervenor.*

(TC 5250)

Plaintiff (taxpayer) appealed from a decision of the Magistrate Division as to the real market value of its property, a multisport fitness club with tennis facilities in Clackamas County, Oregon. Taxpayer argued that because market participants seeking to purchase a multisport club would largely, if not exclusively, consider the income stream of the property when valuing the property, cost would be essentially irrelevant, and generally the income approach to value would be favored for such properties. In addition, taxpayer argued that the county's appraisal, in which primary reliance was placed on the cost approach, should be rejected because market participants generally treat the cost of a property as irrelevant. Taxpayer also argued that, even if a cost approach were to be considered, a 40 percent reduction in the total cost value would be appropriate because the subject property was built with significant superadequacy. Defendant-Intervenor (the county) argued that because multisport clubs are difficult to compare with other properties in the area, and because the property at issue was recently constructed, the cost approach was the best indicator of value. Further, with respect to the income approach conducted by taxpayer's appraiser, the county argued that reliance upon national averages to determine a market rent for a property in the greater Portland area was not compliant with general appraisal theory and was contrary to OAR 150-308-0240(2)(g). The court found that it was compelled to reject the appraisal of taxpayer for failure to rely on local market information for the income approach and for failing to prove the adjustment for superadequacy in the cost approach. The court accepted the appraisal of the county except as with respect to the addition of developer's profit to the raw land value. The court made no finding on the AV or MAV of the property

Trial was held July 18 through 20, 2016, in the courtroom of the Oregon Tax Court, Salem.

Sam B. Zeigler, CKR Law Group, PC, Portland, argued the cause for Plaintiff (taxpayer).

Daniel Paul, Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant Department of Revenue (the department).

Kathleen J. Rastetter, Assistant Clackamas County Counsel, Oregon City, argued the cause for Defendant-Intervenor Clackamas County Assessor (the county).

Decision rendered November 6, 2017. Amended decision rendered December 5, 2017.

## HENRY C. BREITHAUPT, Judge.

### I.   INTRODUCTION

This case is before the court after trial to determine the real market value (RMV) of property owned by Plaintiff (taxpayer). The tax year at issue is 2013-14, with a corresponding assessment date of January 1, 2013. Because the property was recently completed, exception value for new property is at issue.[1]

### II.   FACTS

The facts in this case are drawn from the appraisal reports, trial testimony, and exhibits introduced by the parties.

A.   *The Property*

The property at issue is the Stafford Hills Club (the Club). The Club is owned by taxpayer Stafford Hills Properties, LLC, and operated by taxpayer's wholly owned subsidiary Stafford Hills Management Club. The management entity leases the Club from taxpayer for the operation of the Club. Taxpayer's chairman and CEO, James Zupancic, testified that he structured the rent paid by the management entity to be as close to fair market rent as possible.

The Club is treated by both parties as a multisport club or facility, which is a fitness facility that includes a

---

[1] Under Article XI, section 11(b), of the Oregon Constitution, commonly referred to as Measure 50, and its enacting statutes, the assessed value of a property is the lesser of either the property's real market value or its maximum assessed value. Generally, the maximum assessed value cannot increase more than three percent in any given year. However, there are exceptions to the three percent limit, one of which is for cases of new property or new improvements to property. Or Const, Art XI, § 11(c)(A). Taxpayer does not dispute that there is new property or new improvements in this case. This Amended Opinion corrects the court's Opinion of November 6, 2017, which listed an incorrect assessment date and tax year at issue.

tennis component. Both parties agree that the highest and best use of the property is a multisport club. The Club is located on a 4.9 acre portion of a 15.23 acre parcel of land.[2] The land is zoned low density residential, but the Club has secured a Conditional Use Permit (CUP) for operation of the Club. The Club is the only private tennis facility in the area, and is located near expensive houses.

The Club offers a variety of services to its members. Those services are largely separated between two buildings, a main building and a smaller wellness center.

The main building is 72,188 square feet. Within it, there are seven indoor tennis courts and a two-story clubhouse with a foyer, reception lounge, locker rooms, viewing mezzanine, pro shop, staff offices, and a fitness center.

The wellness center is 18,072 square feet. Within it, there is a beauty salon, laundry, child daycare center, demonstration kitchen, hot yoga room, and a physical therapy treatment center. It also contains locker rooms, multipurpose rooms, and administrative offices.

Between the main building and the wellness center, there is a solar-heated, six-lane saline swimming pool with associated outdoor furniture, and three more tennis courts. There are also two small buildings for maintenance or equipment purposes.

According to Evan Zupancic, the chief operating officer of the Club, the two-building design of the Club was necessitated by a sewer easement than runs through the property between the two buildings. According to one of taxpayer's expert witnesses, Richard Caro, Jr., this two-building configuration negatively affects club operations and, ultimately, the marketability of the Club.[3] The two-building layout results in higher costs than if the facility was all one building. For example, certain staffing costs (such as personnel at each entrance), cleaning costs, and

---

[2] The remaining 10.33 acres of the land is undeveloped wetland.

[3] Richard Caro's relevant qualifications are introduced below under subsection E., "Profiles of Success."

"heating/ventilation/air conditioning system[s]" are unable to be shared between the buildings, and therefore must be duplicated.

## B.  *The Conditional Use Permit (CUP)*

The Club is located on land that is zoned for low density residential purposes. However, as stated, taxpayer has secured a CUP that allows operation of the Club subject to certain conditions.

As pertains to this case, the two most notable conditions of the CUP are (1) that the Club must close operations by 10:00 p.m. daily and cannot resume operations until either 5:30 a.m. on weekdays or 6:30 am on weekends, and (2) that the Club is limited to 138 parking spaces.[4]

Parking is further limited by a provision in the CUP that restricts parking on the eastern area of the parking lot before 8:00 a.m. In addition to the limited number of parking spaces, street parking is prohibited. In witness Evan Zupancic's experience and as a graduate of the International Health Racquet and Sports Club Association (IHRSA) Institute, the industry standard for parking is 275 spaces—nearly double the maximum number of spaces on the property.

These conditions limit both the hours during which the Club may operate (it may not operate as a 24-hour facility) and the number of clients that the Club may serve during those hours. To address the parking issue, taxpayer offers a valet service to its clients. Evan Zupancic testified that the valet service alleviates client frustrations associated with the inability to find a parking spot.

Although the Club could not operate at all without the CUP, the conditions contained in the CUP do appear to limit the revenue that can be generated by operation of the Club. The revenue generated by the Club is relevant to *taxpayer's approach* to estimating the fair market rent of the

---

[4]  Under the terms of the CUP, the number of parking spaces is 122. However, a subsequent parking management plan increased the number of parking spaces to 138.

subject property, described below.[5] However, as discussed below, the revenue impacts on the Club of the CUP are not relevant to estimating the fair market rent of the subject property on the evidence introduced here.[6]

C.   *Nonconforming Use*

The Club, as of the assessment date, was a nonconforming use under the Tualatin Development Code. The CUP was conferred in 2009. The code changed in 2010 such that private clubs—like the Club here—are no longer permissible recipients of conditional use permits. However, the Club can still continue to operate as a nonconforming use, given the CUP.

The court received testimony from CEO James Zupancic on the dangers of operating as a nonconforming use. In Tualatin, if the Club ceases operations for more than 12 months, it loses its right to continue to operate under the terms of the CUP. The Club may re-establish operations only if it is "specifically approved by the Planning Commission." However, approval cannot be granted until after a public hearing is held.

James Zupancic testified that re-approval by the Planning Commission "is far from a slam-dunk," as the neighborhood's reception to the Club is mixed. In addition, the risk associated with re-approval extends beyond the cessation of operations for purely business purposes. In cases of property damage, the risk can be even greater, according to James Zupancic:

> "[I]f there's damage to the non-conforming structure, in many cases you can't rebuild it. Under [Tualatin Development Code Section] 35.050, 'If a non-conforming structure or a structure containing a non-conforming use is destroyed or damaged by any cause'—so that could be a flood, that could be fire, it could be an earthquake, any

---

[5] Taxpayer's approach requires an estimation of feasible rent as a percentage of the revenue of the average club, which taxpayer then compared to the actual rent of the subject property. Accordingly, the revenue of the subject property is relevant to taxpayer's arguments as to the value of the subject property.

[6] Taxpayer has not shown that the *fair market rent* for a multipurpose athletic club is based on a percentage of the revenue earned by the athletic club, such as a percentage-of-revenue rent payment. Indeed, the Club itself, and the rent comparables, appear to be subject to flat rent payments based on the number of square footage—not the income of the club.

other act of God, man-made, it could be a terrorist attack, who knows what—'requiring the discontinuance of the use *for more than six months* while making repairs of future structure or use on the property, shall conform to the provisions of the Tualatin Community Plan, unless reinstatement of the non-conforming structure or use is approved by the Planning Commission."

(Emphasis added.)

These risks are, according to James Zupancic, considered by credit underwriters in "assessing risk and establishing the applicable interest rate for secured financing of real property." Taxpayer's expert witness, Richard Caro, testified that a market purchaser of this property would consider the CUP as a negative as compared to a club operating without the need for a CUP.

D.   *The Market for Multisport Facilities*

The parties disagree on how comparable fitness-only facilities—that is, facilities without a tennis component—and even other multisport facilities are to the subject property for valuation purposes. Accordingly, an understanding of the multisport facility market is important to the resolution of this case.

Taxpayer's expert witness, Richard Caro, testified that the multisport club market is a subset of the overall athletic club market, with fitness-only clubs being a separate subset. The defining characteristic of a multisport club is a tennis component. Tennis courts require a significant amount of space, and courts range in size between 6,000 and 7,000 square feet. Accordingly, multisport clubs are usually larger facilities.

On the strength of Richard Caro's testimony, the evidence supports a finding that multisport clubs are difficult to compare to at least fitness-only facilities, if not also to other multisport clubs. Regardless, even if sales of other multisport clubs could be relevant for valuation purposes, there are generally "very few" sales of multi-sport facilities to use as comparable sales. This evidence is corroborated by the lack of multisport facilities—that is, facilities with a tennis component—used as sales or rent comparables by either appraiser.

Generally, multisport clubs share several characteristics, which indicate that multisport facilities as a category are manifestly different from fitness-only facilities. These characteristics also indicate that multisport facilities are typically unique offerings and difficult to compare to each other.

Principally, according to Richard Caro, multisport clubs have a tennis component. As a result, they often have a very large indoor component and a significant outdoor component. Each club is uniquely configured. Including construction, it takes up to two years to complete development of a club. Multisport clubs typically own their own real estate or pay rent rates that are "extremely low," *e.g.*, $2.00 to $6.00 per-square-foot.

Multisport clubs tend to attract couples and families rather than individual members, and member retention is usually higher as a result. Because of its relatively complex and unique nature, a multisport club requires "a higher level of staff because it has to have experts in each area" of programing or service that it provides. Accordingly, multisport clubs "charge higher fees and yield higher revenue per member." However, they also "take longer to market their club's concept to do the proper selling and get trial members, thus they have a slower ramp-up of membership over time in their life cycle."

Finally, although multisport clubs do compete with each other and fitness-only clubs (because of their fitness component), Richard Caro testified that "a pure fitness equipment user would not join a multi-sport club and pay more money unless he thought he would soon, either add family members to the membership, or engage in one or more of the other activities and offerings in order to pay a higher amount of money."

Richard Caro also testified on the market and characteristics of fitness-only clubs. Fitness-only clubs lease their space, rather than own it. Fitness-only clubs are also space efficient with respect to how many members it can attract per square foot. Fitness-only clubs can attract approximately "one member for every eight to nine square feet," as compared to multisport facilities that can only serve up

to four people on a 6,000 square foot tennis court. Because fitness-only clubs do not have tennis courts, they are typically smaller.

Generally, fitness-only facilities attract individuals on a monthly dues-based membership. Fitness-only facilities are also more interchangeable, quicker to open, and have offerings that are more readily recognizable by members, investors, owners, and the public as opposed to multi-sport facilities, which may be more peculiar or unique in size, scope, and offerings.

E.   *"Profiles of Success"*

The court also heard testimony from Richard Caro on industry data integral to the income approach to value of taxpayer's appraiser. Richard Caro is the president of a "full-service management consulting company, focusing on the health club and fitness industry." He is also the founder of IHRSA.

IHRSA is a global trade association serving "over 10,000 clubs in about 80 different countries around the world." IHRSA conducts educational programs, research, and lobbying efforts associated with the athletic club industry. IHRSA also prepares reports for the athletic club industry. One of the reports prepared by IHRSA is "Profiles of Success." As explained by the witness:

> "[Profiles of Success] is prepared by asking individual club owners and leaders to provide confidential financial information, membership information, pricing information, all kinds of confidential information, to an independent third party, not even IHRSA, an outside research company called Industry Insights, and they collect the information and then tabulate it and provide the data for IHRSA, who then writes up their conclusions in a report each year that's called Profiles of Success."

Richard Caro testified that Profiles of Success is used by various parties in the athletic club industry, including owners, operators, investors, appraisers, assessors, and lenders. According to Richard Caro, the reports are the "authoritative" and "best" source for athletic club industry data nationally. The reports also provide an

industry-accepted methodology for estimating the amount of rent and real estate taxes that the operator of an athletic club can feasibly pay.

F.   *Taxpayer's Appraisal*

Taxpayer's appraiser conducted an income, sales comparison, and cost approach to value the subject property. Although taxpayer's appraiser conducted all three approaches, he concluded that the most reliable indicator of value was the income approach.

1.   *Income approach*

An appraiser conducting an income approach to value using the direct capitalization method generally (1) determines the market rent for a piece of property; (2) multiplies it by the total rental space to determine the potential gross income (PGI); (3) deducts a market rate of vacancy and collection loss from the PGI to determine the effective gross income (EGI); (4) deducts a market rate of non-reimbursable expenses from the EGI to determine the net operating income (NOI); and finally (5) divides the NOI by a market capitalization rate to determine the value of the property.[7]

Typically, appraisers will consider other relevant rental rates in the market to determine the "market" rent for a property. Here, taxpayer's appraiser determined that there was a "lack of relevant lease rate comparisons" for multi-sport athletic clubs, and therefore estimated the market rent feasible for the Club using IHRSA data.

To estimate the market rent, taxpayer's appraiser consulted both the 2013 IHRSA Profiles of Success report (which contains 2012 calendar year data) and the 2014 IHRSA Profiles of Success report (which contains 2013 calendar year data).

For each year, taxpayer's appraiser first determined the total amount of rent that would be paid by a typical athletic club. He began by looking up the mean annual revenue for athletic clubs. Then, he looked up the mean rent

---

[7] *See generally*, Appraisal Institute, *The Appraisal of Real Estate*, 491 (14th ed 2014).

allocation as a percentage of revenue. By multiplying these two numbers, taxpayer's appraiser calculated the mean gross rent amount due for the typical athletic club.

Next, taxpayer's appraiser determined the size of a typical athletic club. He began by looking up the mean membership count for an athletic club. Then, he looked up the facility area per member. Using these two numbers, taxpayer's appraiser calculated the mean size of the typical athletic club.

Taxpayer's appraiser then used both of the previous calculations to calculate the mean rent per-square-foot that is feasible for a typical athletic club.

Taxpayer's appraiser conducted calculations using both the 2013 report and the 2014 report. The mean rent per-square-foot calculated by using the 2014 report was higher than that calculated by using the 2013 report. Taxpayer's appraiser concluded that, as of the assessment date, a market purchaser would be aware of the improving market conditions. Accordingly, taxpayer used the mean rent determined using the 2014 IHRSA report.

Taxpayer's mean rent calculations were as follows:

- ($5,026,400 mean revenue) x (7.1% proportional mean rent) = $356,874 mean rent

- (2,959 mean membership) x (14.1 facility area per member) = 41,722 square-foot mean area

- ($356,874 mean rent) ÷ (41,722 square feet mean area) = $8.55 per-square-foot mean feasible rent

The $8.55 per-square-foot mean feasible market rent was somewhat lower than the actual rent paid to taxpayer by its wholly owned management subsidiary. Recall that James Zupancic testified that the actual rent was structured to be as close as possible to market rent. Taxpayer's appraiser compared both the feasible rent and the actual rent and determined that the market rent for the Club was $8.75 per-square-foot. The court's doubt as to the persuasiveness of this check is discussed in the analysis section of this opinion.

Using that market rent, taxpayer's appraiser determined a PGI of the property of $789,775.

Taxpayer's appraiser then deducted 10 percent from the PGI for vacancy and collection allowance because "it can be reasonably concluded that a knowledgeable purchaser would budget at least a one-year contingent vacancy allowance at the end of an initial 10-year lease term." This results in an EGI of $710,797.

Taxpayer's appraiser then deducted four percent of the EGI for non-reimbursable expenses rate, equally attributable to structural reserves and executive management. Accordingly, taxpayer's appraiser determined an NOI of $682,365.

Finally, taxpayer's appraiser determined the market capitalization rate. Taxpayer's appraiser considered the market capitalization rates based upon his comparable sales analysis, with a range of approximately eight percent to nine percent, and the 2012 Price Waterhouse Cooper National Net Lease Market Survey, which reported a range of six percent to 8.75 percent for capitalization rates. Ultimately, because the Club was not yet stabilized, and subject to additional risk because of the CUP, taxpayer's appraiser determined a market capitalization rate of nine percent for the Club.

Applying the nine percent market capitalization rate to the NOI of $682,365, taxpayer's appraiser calculated a rounded value for the subject property of $7,600,000.

2. *Sales comparison approach*

Taxpayer's appraiser placed secondary emphasis on the sales comparison approach because no sufficiently comparable sales could be located: "Interviews with numerous market participants did not result in identification of any health club purchases by local private party/non-credit strength tenants that were even generally similar to the subject property as to age, condition, quality and net lease revenue potential." The sales that taxpayer's appraiser did find were primarily closed businesses sold for redevelopment. Nevertheless, taxpayer's appraiser conducted a sales comparison approach analysis and determined a value of $9,000,000 for the Club.

### 3.   *Cost approach*

With respect to the cost approach, taxpayer's appraiser determined that the direct costs associated with constructing the Club were $9,908,016. The indirect costs according to taxpayer's appraiser were $417,449, yielding a total of $10,325,465 for both direct and indirect costs.

Taxpayer's appraiser then added a five percent developer's profit allowance in construction of the subject property. The total cost plus developer's profit equals $10,841,738. Taxpayer's appraiser determined that five percent was appropriate in lieu of the still-lingering effects of the 2008 recession, when a standard developer's profit was as high as eight percent.

Taxpayer's appraiser then determined a value for the land, which was somewhat complicated by the fact that only 4.9 acres of the 15.23 acre parcel of land were developable—the remainder being undevelopable wetland. Because the land is zoned low density residential, taxpayer's appraiser estimated how many homesites might be developable on the land, and determined the market price for each homesite.

Ultimately, taxpayer's appraiser determined that 35 homesites could be developed on the land at a value of $40,000 each, resulting in a value for the land of $1,400,000. This results in a total cost value of the property of $12,241,738.

Because the Club was recently completed as of the valuation date, taxpayer's appraiser determined no depreciation was appropriate. However, taxpayer's appraiser deducted 40 percent from the cost value of the property (not including land) for superadequacy of the Club associated with the limitations of the CUP, including parking. This results in a rounded $8,000,000 in value determined by the cost approach.

The court will introduce facts relevant to discuss the rationale for the superadequacy deduction in the analysis section to this opinion.

4.   *Reconciliation of value*

In sum, taxpayer's appraiser determined a value for the subject property of $7,600,000 using the income approach, $9,000,000 using the sales comparison approach, and $8,000,000 using the cost approach. Taxpayer's appraiser placed primary emphasis on the income approach, with secondary emphasis placed upon the sales comparison and cost approaches.

Taxpayer's appraiser determined that the income approach indicated a valuation floor of $7,600,000 because a market purchaser could expect that conditions were improving and that the Club was a "long-term opportunity for membership growth." Taxpayer's appraiser then surmised that the sales comparison approach value of $9,000,000 was unobtainable because the sales comparables could be purchased for repurposing or redevelopment, where the subject property, as a non-conforming use in a low density residential area, could not be. Accordingly, taxpayer's appraiser determined a value for the subject property of $8,000,000.

G.   *The County's Appraisal*

The appraiser for Defendant-Intervenor Clackamas County Assessor (the county) also conducted an income, sales comparison, and cost approach to value the subject property. Although the county's appraiser conducted all three approaches, he placed the most reliance on the cost indicator of value.

1.   *Income approach*

In conducting the income approach analysis, the county's appraiser considered seven rent comparables, that indicated a market rent range from $15.58 per-square-foot to $28.50 per-square-foot. The county's appraiser noted, "The subject property is a multi-purpose fitness facility with an emphasis on tennis. No other leased facilities were identified that similarly emphasized tennis." This was relevant because "The square footage of the subject facility is considerably larger than the identified comparable lease properties due to the tennis element." Such differences in size and offering would require adjustment.

The county's appraiser rejected the higher comparable rental rates and determined that the market rent for the Club would be between the rental rate of $15.58 per-square-foot for comparable #7 and $19.00 per-square-foot for comparable #5. Comparable #5 is a 24 Hour Fitness franchise, which, while occupying 45,000 square feet, has no tennis courts. Comparable #7 is a former athletic facility, which also had no tennis courts and in addition was vacant.

The county's appraiser determined a market rental rate of $17.00 per-square-foot, resulting in a PGI of $1,467,491. The county's appraiser then deducted a vacancy and credit loss factor of five percent or $73,375. The county's appraiser then deducted three percent or $41,823 in non-reimbursable operating expenses and structural reserves of $8,362. Accordingly, the county's appraiser determined a NOI of $1,343,661.

The county's appraiser considered the capitalization rates of several comparables and determined a market capitalization rate for the subject property of 8.75 percent. Accordingly, capitalization of the NOI for subject property results in a value of $15,356,126. However, the county's appraiser deducted $104,151 in unfinished work that must be completed, resulting in a final rounded value of $15,252,000.

### 2.  *Sales comparison approach*

The county's appraiser conducted a sales comparison approach and determined a value of $15,866,000. However, the county's appraiser noted that "The subject property differs significantly from the identified comparable sales because of the high percentage of the building area devoted to tennis courts." The county's appraiser was unable to use comparable sales to extract an appropriate adjustment. Instead, the county's appraiser utilized the Marshall Valuation Service and his appraisal judgment to determine a downward adjustment of 10 percent for the subject property to account for the presence of tennis courts.

### 3.  *Cost approach*

In conducting the cost approach, the county's appraiser noted, "No comparable building costs were

identified in the relevant market area for multi-purpose fitness facilities with extensive tennis courts." Accordingly, the county's appraiser utilized Marshall Valuation Service, "a reliable, national cost estimating service" to estimate the cost value of the Club. Using the service, the county's appraiser estimated a direct cost of the Club of $10,595,481. The county's appraiser requested actual cost information from taxpayer, from which the county's appraiser determined a total actual direct cost of $11,201,595. The county's appraiser used the actual direct costs of $11,201,595 in his cost approach.

The county's appraiser then determined the indirect costs associated with the Club. The county's appraiser requested indirect cost information from taxpayer. The county's appraiser determined that certain indirect costs were not included or understated in taxpayer's records, including:

- $56,178 for obtaining a LEED Certification

- $10,184 in understated system development charges (sewer, water, transportation)

- $139,653 in understated building permit fees

Upon adding these costs, the county's appraiser determined a total indirect cost associated with the Club of $1,848,927.

In total, the direct and indirect costs of the subject property were determined by the county's appraiser to be $13,050,522. However, the county's appraiser deducted $104,151 in incomplete work from the total direct and indirect costs, resulting in an improvement cost of $12,946,371.

With respect to the value of the land, the county's appraiser reviewed five land sales comparables and determined an initial value of $5.50 per-square-foot. However, the appraiser deducted 10 percent from the value of the land on the basis that the subject property is in a flood plain, resulting in a value of $5.00 per-square-foot, or a rounded $1,069,000 raw land value for the subject property.[8]

---

[8] For assessment purposes, the county's appraiser determined the total cost of the land plus improvements tied to the land. To the $1,069,000 in land value, the county's appraiser added $1,400,000 for the cost of mitigating the wetlands

In total, the county's appraiser determined a land value plus improvement cost of $14,015,371. To that total, the county's appraiser added a 10 percent developer's profit (based on an estimated developer's profit range of eight percent to 20 percent), resulting in a rounded $15,417,000 in cost value for the subject property. The county's appraiser determined that no depreciation was appropriate because the subject property was in new condition as of the assessment date. The county's appraiser also determined that no superadequacy adjustment was appropriate.

### 4.  *Reconciliation of value*

In sum, the county's appraiser determined a value for the subject property of $15,252,000 using the income approach, $15,866,000 using the sales comparison approach, and $15,417,000 using the cost approach. The county's appraiser placed primary emphasis on the cost approach because the subject property was unique in comparison to the comparables used in the sales comparison and income approaches. The county's appraiser determined a final value for the property of $15,417,000. Because some of the improvements are allocated to the land value, the county's appraiser determined the net improvement value for assessment purposes to be $11,971,000.

Additional facts will be introduced as necessary in the analysis section of this opinion.

### III.  ISSUE

The issue in this case is the RMV of the subject property as of the assessment date.

### IV.  ANALYSIS

This case concerns the valuation of real property. For purposes of property assessment and taxation, real and

----

portion of the subject property, which mitigation allowed development of the Club. Next, the county's appraiser determined the on-site development costs for the subject property. The county's appraiser utilized the county's On-site Development Land Cost Table. From that table, the county ascertained a cost of $4.57 per-square-foot for a five acre site on sloping terrain, representing a gross of $977,432 in on-site development costs. In total, the county's appraiser determined a cost value of the land for property tax assessment purposes of $3,446,000.

personal property is valued at 100 percent of its RMV. ORS 308.232.[9] RMV is defined in Oregon as

> "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

ORS 308.205(1). The RMV of property is ultimately a question of fact. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001).

Subject to some limitation, the legislature has determined that RMV "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). This court's rules require that a party relying upon an Oregon Administrative Rule (OAR) of the department for purposes of determining RMV under ORS 308.205 must so indicate its reliance on that rule. Tax Court Rule (TCR) 20 I. Methods of accounting or valuation, unless otherwise prescribed by law or regulation, are to be analyzed in light of the evidence introduced by the parties. *Bylund v. Dept. of Rev.*, 292 Or 582, 585, 641 P2d 577 (1982).

Taxpayer has not relied upon any rules of the department. The county, however, has relied upon OAR 150-308-0240(2)(g),[10] which states, in relevant part, "The income to be used in the income approach must be the economic rent that the property would most probably command in the open market *as indicated by current rents being paid, and asked, for comparable space*." (Emphasis added.)

In this case, taxpayer has admitted that it has the burden to prove, by a preponderance of the evidence, the RMV of the subject property. ORS 305.427. However, this

---

[9] Unless otherwise indicated, the court's references to the Oregon Revised Statutes (ORS) are to the 2013 edition.

[10] The county also cited OAR 150-308-0240(2)(a), which requires all three approaches (cost, sales, and income) to be considered, and OAR 150-307-0010 (2)(a)(A)(ii), which requires on-site development costs to be added to the land for purposes of property tax assessment. The former rule is not in dispute as taxpayer's appraiser conducted all three approaches in his appraisal. The latter, while relevant in a general sense, does not appear to be disputed by taxpayer and does not appear to be relevant to this case for purposes of determining the real market value of the subject property.

court also has the authority to determine the RMV of property "without regard to the values pleaded by the parties." ORS 305.412.

Fundamentally, this case is about how an appraiser approaches an appraisal assignment when that assignment is complicated by the fact that there are few, if any, market sales or rent comparables in the area similar to the subject property. The task in this case is compounded by the fact that there is minimal operating history of the Club because it was recently completed. Finally, this case is further complicated by the existence of at least some evidence that the cost paid for the newly constructed facility overstates its value because the Club was built too large and there is significant superadequacy.

Accordingly, in this case, there are questions as to the reliability or persuasiveness of all three approaches— sales, income, and cost. Nevertheless, this court is tasked with determining which appraisal, if any, is more likely than not a correct determination of the value of the Club.

This court will first summarize the positions of the parties before analyzing the key appraisal issues. As noted in the introduction to this opinion, the RMV determined for this year is of particular importance to the parties because the Club, being recently constructed, is treated as new property for purposes of determining an initial maximum assessed value (MAV) and assessed value (AV).

A. *Taxpayer's Position*

The essence of taxpayer's position is simply stated. Market participants seeking to purchase a multisport club would largely, if not exclusively, consider the income stream of the property when valuing the property. Cost is essentially irrelevant. This position certainly has at least facile appeal, as the Club is an income-producing property, and generally the income approach to value is favored for such properties.

In addition, taxpayer argues that the county's appraisal, in which primary reliance was placed on the cost approach, should be rejected because market participants generally treat the cost of a property as irrelevant. Taxpayer

also argues that, even if a cost approach is to be considered, a 40 percent reduction in the total cost value is appropriate because the subject property was built with significant superadequacy.

B.   *The County's Position*

The county's position is also simply stated. Because multisport clubs are difficult to compare with other properties in the area, and because the Club was recently constructed, the cost approach is the best indicator of value. Further, with respect to the income approach conducted by taxpayer's appraiser, the county argues that reliance upon national averages to determine a market rent for a property in the greater Portland area is not compliant with general appraisal theory and is contrary to OAR 150-308-0240 (2)(g).

C.   *Income versus Cost for Newly Constructed Properties*

Principally, resolution of this case depends upon which approach to value this court finds most persuasive on the evidence presented—the income approach or the cost approach. Neither party's appraiser placed significant emphasis on the sales comparison approach due to the lack of relevant sales comparables.

In theory, both approaches could be quite appropriate in this case because the subject property is both income-producing and was recently constructed. The income approach to value is generally useful in the valuation of income-producing properties. The cost approach is generally useful in the valuation of recently constructed properties.

That said, this court is not persuaded by the income approach conducted by taxpayer's appraiser. The income approach to value uses market information to determine the market value of the property. However, both appraisers struggled with the fact that the market information on rental rates for multisport facilities similar to the Club is lacking. On that basis, taxpayer's appraiser opted to conduct an alternative method of determining market rent.

Taxpayer's appraiser made inferences on *national* averages to determine the *local* market rent for the Club,

which is located in Oregon. That approach, while creative, does not give the court confidence that the local market rent for the Club has been determined. Also, it does not use local market rental rates to determine the appropriate market rate for the Club as required under OAR 150-308-0240 (2)(g).

Moreover, using the actual rent by the Club as corroborative evidence is not persuasive. The lease between tenant and landlord is not the result of an arms-length transaction. But more importantly, the actual rent was calculated in a similar manner to the appraiser's estimation of market rent and was also based on IHRSA data. That greatly reduces the actual rent's value as an independent check on the market estimated value.

As stated by James Zupancic in his direct testimony:

"Witness:   And I should say, Counsel, if I may, these rent amounts were determined to be as close as we could determine fair market rent. Because as a matter of law, and since I have the disability of being a lawyer as well as a businessman, I wanted to make sure that this was a relationship between these two entities that would be upheld as being a proper relationship, since both would be dealing with each other as if it was an arm's length relationship,

"Counsel:   And as part of that analysis, did the club project anticipated revenues that it would have once it actually started getting up and running?

"Witness:   Yes. We had—we brought investments into this—this particular project. And it was necessary for us to be able to make financial projections. And we made financial projections of gross revenue going out at least several years.

"Counsel:   And is this average annual effective rent number that I've just described, the $793,000 and change, ultimately was that a number that you felt in developing the club was a sustainable rent, given projected operations going forward?

"Witness:   I would say that it was on the high side of sustainable, because you have to look at what the stabilized revenue would be of a club like ours. And at approximately $790,000 in annual rent, we would have to generate

a tremendous amount of income off of this property, but we felt that the potential was there, and that we could do it.

"So given our projections, we felt that this was in the range of what the IHRSA data had provided to us with regard to an expectation of percentage rent—or excuse me—rent as a percentage of gross revenue."

As explained in the ultimate paragraph of the previous testimony, James Zupancic developed the actual rent by using "IHRSA data" to determine an "expectation of * * * rent as a percentage of gross revenue." That creates a significant problem to taxpayer's appraisal as to the persuasiveness of using IHRSA data to determine the fair market rent. The use of the actual rent of the Club as a check on the estimated market rent is circular in that both the estimated market rent and the actual rent are based on interpretations of the IHRSA data.

Taxpayer's appraiser, by backing up his estimation of market rent (determined using IHRSA data) on the actual rent of the club (determined using IHRSA data) does not address the primary weakness of the appraisal: the data provides national figures, which are not persuasive for local market determinations, and not acceptable under OAR 150-308-0240(2)(g). For these reasons, the court rejects taxpayer's income approach.

With respect to the county's income approach, the county's appraiser only placed secondary emphasis on the income approach. Taxpayer argues that the county's income approach should be disregarded because it relies on rents of properties that are not similar to the subject property.

There is substantial evidence in the record that multisport clubs are difficult to compare to other clubs, whether fitness-only or multisport. However, this court is wary of making a finding that any attempt to use rent or sales comparables for a multisport club renders the related appraisal analysis unsound.

Fortunately, in taxpayer's view, the county's appraiser relied solely on the cost approach. Accordingly, this court may avoid addressing how, if at all, to conduct an income or sales comparable analysis when market evidence is lacking.

For this property, given the lack of market information available for use in the income approach to value, and given the fact that the property was recently constructed, the court considers the cost approach to be more persuasive. Of course, properties can be and sometimes are built costing more than they are worth. Indeed, taxpayer has argued that is what has occurred here, and James Zupancic testified that he knew that going in and hoped to make up the difference through operation of the Club. Taxpayer also argues, and introduced supporting evidence, that market participants do not significantly rely on the cost of a property when determining its value. However, when market comparisons are lacking, and the property is newly constructed, the court finds that the cost approach to value is more reliable and persuasive than the income approach to value.

Whether the initial value determined under the cost approach must be adjusted for superadequacy is a separate question to which the court now turns.

D.  *Superadequacy*

In his cost approach to value, taxpayer's appraiser made a deduction of 40 percent of the total cost for superadequacy. Just as he did in his income approach to value, taxpayer's appraiser turned to the national averages in the IHRSA Profiles of Success report. As detailed by taxpayer's appraiser:

"As presented in the 2014 IHRSA survey data, it is evident that multi-sport facilities such as the subject are functionally competitive in the marketplace with approximately 14.1 square feet per member. The *mean member count* was 3,581 whereas the *mean facility size* was 50,168 square feet. The forecasted member count for the subject property was 1,233 at the end of 2012 and 2,874 as to 2013. At the average of 2,053 members, the corresponding functional equivalent size for the subject based upon IHRSA survey data would have been a facility that was approximately 30,000 square feet. Given the actual size of the subject property (90,260 SF), it therefore represented an over-improvement of approximately 60,000 square feet which can be largely attributed to the wellness center and the fact that the facility was constructed in two separate buildings which created cost inefficiencies. Other indexes are also relevant. The actual size of

the subject (90,260 SF), when compared to the *mean facility size* (50,168 SF), suggests a 45 percent super-adequacy. The 2013 year end member count of 2,803, when compared to the *industry mean* of 3,558, suggests in excess of 20 percent capacity underutilization. Similarly, the 2013 member count represents 32.2 square feet of indoor space per member which is more than double *the industry mean*. The ability to increase the number of members substantially beyond the forecasted maximum threshold may not have been possible due to on-site parking limitations which is further compounded by parking restrictions associated with the conditional use permit. Therefore, it can be reasonably and factually concluded that the functional super-adequacy of the existing structures is incurable. Given these considerations, and the corresponding depreciation range indicated by the various indexes of roughly 20 to 50 percent, depreciation has been estimated at 40 percent of replacement cost, all of which has been attributed to super-adequacy. This estimate is all-inclusive of various property characteristics that contribute to inefficiency and super-adequacy.

"By far, the greatest influence is the atypically large size of the facility relative to membership. Integration of a 'wellness center' is also atypical of the multi-sport facility model and may not have contributed to membership growth to the extent anticipated by the developer."

(Emphases added.)

This court cannot accept taxpayer's superadequacy argument. Taxpayer has introduced evidence to support the finding that multisport facilities are difficult to compare even to other multisport facilities.[11] Accordingly, reliance upon national averages to determine what constitutes the appropriate size for taxpayer's unique offering to the local marketplace is both unpersuasive and counter to taxpayer's evidentiary arguments with respect to other parts of the appraisal process.

Furthermore, the Club was recently constructed. Relying upon membership forecasts for the first two years of its existence to determine superadequacy does not fit the evidence, introduced by taxpayer, that multisport clubs

---

[11] For example, Richard Caro stated, "each [multisport] club is a unique club, which makes it hard to generalize, hard to compare to others, and hard to predict its outcome."

take multiple years to achieve stabilization of membership. Taxpayer can guess that it has constructed too large of a facility based on the number of parking spaces that it has. However, that estimate is insufficient to survive taxpayer's burden to show that the subject property is more likely than not subject to a 40 percent superadequacy adjustment.

Finally, taxpayer's appraiser suggests that the existence of a wellness center and the size of the Club are atypical of the industry. Such arguments are not persuasive. First, the evidence suggests that most if not all multisport clubs are unique to some extent, so it is not clear what relevance to superadequacy there is in the atypical nature of a wellness center.

Second, with respect to the size of the Club, the evidence introduced by taxpayer indicates that multisport facilities are typically larger offerings. Indeed, the county's appraiser noted four athletic clubs, two of which had a tennis component, which clubs had sizes ranging from 115,470 square feet to 232,638 square feet. The court cannot conclude that the Club, given its unique mix of offerings, is more likely than not too large.

On the evidence introduced in this case as to this tax year, this court cannot conclude that a 40 percent superadequacy adjustment to the cost approach is appropriate.

E.  *Developer's Profit*

The parties' appraisers differed in their treatment of developer's profit. The county's appraiser added a developer's profit to the total cost of the Club, *including the cost value of the raw land*. Taxpayer's appraiser, however, only added a developer's profit to the direct and indirect cost of *construction* related to the Club. The position of taxpayer's appraiser is in line with accepted appraisal methodology in *The Appraisal of Real Estate* (14th ed). The county's appraiser gave no justification for adding a developer's profit to the raw land value, and the addition of such developer's profit to the raw land value is rejected.

The court notes that each party's appraiser determined a substantially different developer's profit rate. The

county's appraiser determined a rate of 10 percent, based upon an estimated range of eight percent to 20 percent. Taxpayer's appraiser determined a rate of five percent, based upon the eight percent rate before the 2008 recession, reduced by the effects of the 2008 recession. Neither party expended any briefing on why their appraiser's determination of the developer's profit rate was correct. Because taxpayer failed to carry its burden of proof, the court will accept the county appraiser's determination of the developer's profit rate.

F.   *Value of the Property*

Having considered the appraisals of each party, the court must now determine the value of the property. The court is not persuaded by taxpayer's appraisal. It is therefore rejected.

The RMV assessed and determined by the BOPTA for the subject property was $12,774,442. After litigation in the Magistrate Division, the magistrate issued a Final Decision in which the RMV of the property was determined to be $14,569,700. *Stafford Hills Properties, LLC v. Clackamas County Assessor*, TC-MD 140184N (May 1, 2015) (slip op at 26).

Taxpayer, as Plaintiff, is the only party that filed a complaint in this case. However, the county filed in its answer in the Regular Division a "counterclaim" that the RMV of the subject property is $15,173,000. The county's appraiser determined a cost value of $15,417,000. This court has the statutory authority to determine the correct value of the property regardless of the values pleaded by the parties. ORS 305.412.

With the exception of the developer's profit calculated by the county as noted above, the court accepts the RMV determination of the county's appraiser. The improvement value determined by the county is also accepted, except as must be modified by recalculation of the developer's profit.

Previously, by joint motion of the parties, this court ordered that the issues of RMV and the changed property

ratio used by the county to determine the MAV and AV of the property were to be bifurcated, with resolution of the RMV issue to be decided first. Accordingly, this court makes no determination on the AV or the MAV associated with the Club resulting from this opinion.

## V.   CONCLUSION

The court rejects the appraisal of taxpayer for failure to rely on local market information for the income approach and for failing to prove the adjustment for superadequacy in the cost approach. The court accepts the appraisal of the county except as noted with respect to the addition of developer's profit to the raw land value. The court makes no finding on the AV or MAV of the property. Now, therefore,

IT IS THE DECISION OF THIS COURT that the county will provide the court with an updated RMV of the property after adjustment of the developer's profit.

IT IS FURTHER DECIDED that the parties will address the issue of what AV and MAV results from the updated RMV.